# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00756-SCT

*WILLIAM B. SLIGH AND LUCY M. SLIGH*

*v.*

*FIRST NATIONAL BANK OF HOLMES COUNTY
AND HARRELD CHEVROLET COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/1997 |
| TRIAL JUDGE: | HON. JOHN B. TONEY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL S. ALLRED |
| | J. M. RITCHEY |
| | MARK McDOUGAL |
| | VICKI ROBINSON SLATER |
| ATTORNEYS FOR APPELLEES: | ROGER C. RIDDICK |
| | JAMES L. CARROLL |
| | L. BRADLEY DILLARD |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 2/4/1999 |
| MOTION FOR REHEARING FILED: | 3/16/99 |
| MANDATE ISSUED: | 6/24/99 |

**BEFORE PITTMAN, P.J., SMITH AND MILLS, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. On January 30, 1993, William Sligh and Gene Lorance were involved in an automobile accident. William was paralyzed as a result of the accident. Gene Lorance was the son of Arthur and Edith Lorance. On September 7, 1988, Edith Lorance executed a trust agreement whereby an inter vivos trust consisting of $100,000 was created for the benefit of herself and her adult son Gene Lorance. By its terms, the trust was to continue during the lifetime of Edith Lorance and Gene Lorance, terminating on the death of the survivor of either. At that point, the trust property would vest in other beneficiaries. By the terms of the trust, First National Bank (hereinafter FNB) was appointed as trustee for the purpose of administering trust

assets.

¶2. On September 29, 1989, Edith Lorance died, and pursuant to her last will and testament, all of her personal effects, jewelry, household goods and automobiles went to Gene Lorance. Her financial assets went to FNB in trust for Gene Lorance during his lifetime. As trustee for both the inter vivos and testamentary trusts, FNB was given full and complete authority to "expend all or any part of the income or corpus of said trust property for the benefit of Gene Lorance... Trustee shall exercise the powers herein granted for what may be, in the discretion of ...said Trustee, in the best interest of the said Gene Lorance, and shall pay the said Gene Lorance such sums and at such times as... said Trustee thinks in his best interest." FNB administered the combined trust assets of approximately $300,000 pursuant to the trust terms, and provided Gene Lorance a monthly stipend of $1500 to provide for his living expenses. Gene Lorance lived alone and paid his own bills.

¶3. On August 21, 1990, Gene Lorance obtained financing from FNB and purchased a 1991 Chevrolet S-10 pick-up truck from Harreld Chevrolet.

¶4. On January 30, 1993, two and one-half years after Lorance purchased the truck, Lorance was operating his truck while under the influence of alcohol when he collided head on with the vehicle being operated by William Sligh.

¶5. The complaint in this case was filed by William and Lucy Sligh against FNB and Harreld Chevrolet in the Circuit Court of Madison County, Mississippi, on September 23, 1994. On February 12, 1997, the trial court granted Harreld Chevrolet's Motion for Summary Judgment. On May 9, 1997, the trial court granted FNB's Motion for Summary Judgment. William and Lucy Sligh moved for reconsideration of both orders, which were denied by the lower court. It is from this judgment that the Slighs appeal. This is an appeal from a summary judgment predicated on the finding that there are no disputed issues of fact which could conceivably give rise to a prima facie case. The following issues are presented to this Court on appeal:

**I. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT FOR HARRELD CHEVROLET WAS ERROR.**

 **A. HARRELD CHEVROLET IS LIABLE FOR NEGLIGENT ENTRUSTMENT.**

 **B. HARRELD CHEVROLET IS LIABLE FOR SUPPLYING LORANCE WITH A DANGEROUS INSTRUMENTALITY.**

 **C. THE NEGLIGENCE OF HARRELD CHEVROLET WAS A PROXIMATE CAUSE OF WILLIAM SLIGH'S INJURIES.**

**II. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT FOR FIRST NATIONAL BANK WAS ERROR.**

 **A. THE BANK'S RELATIONSHIP WITH LORANCE CREATED LEGAL DUTIES OF THE BANK.**

 **B. THE NEGLIGENCE OF THE BANK WAS THE PROXIMATE CAUSE OF WILLIAM SLIGH'S INJURIES.**

**C. THE BANK IS LIABLE FOR ENTRUSTING A DANGEROUS INSTRUMENTALITY TO LORANCE.**

**D. THE BANK IS LIABLE FOR BREACH OF FIDUCIARY DUTIES**.

## STANDARD OF REVIEW

¶6. The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under Rule 56(c). This Court conducts a de novo review of orders granting or denying summary judgment and looks at all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt. *Aetna Cas. and Sur. Co. v. Berry*, 669 So.2d 56, 70 (Miss.1996) (quoting *Mantachie Nat. Gas v. Mississippi Valley Gas Co.*, 594 So.2d 1170, 1172 (Miss.1992)).

¶7. "The focal point of our standard for summary judgment is on material facts." *Erby v North Mississippi Medical Center,* 654 So. 2d 495, 499 (Miss. 1995). If the party opposing the motion is to avoid entry of an adverse judgment, he or she must bring forth evidence which is legally sufficient to make apparent the existence of triable fact issues. *Id.* Summary judgment is mandated where the nonmoving party fails to show evidence sufficient to establish the existence of an essential element to his case. *Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1214 (Miss. 1996).

## LEGAL ANALYSIS

## I. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT FOR HARRELD CHEVROLET WAS ERROR.

¶8. The Slighs argue that Harreld Chevrolet's Motion for Summary judgment should not have been granted because Harreld is liable for negligent entrustment; Harreld is liable for supplying Lorance with a dangerous instrumentality; and Harreld was a proximate cause of William Sligh's injuries.

¶9. The Slighs contend that the trial court's holding that a seller could not be liable for negligent entrustment because it no longer owned the vehicle at the time of the accident is not and never has been the law in Mississippi.

¶10. The Slighs argue that although title had passed to Gene Lorance, this fortuitous event did not absolve Harreld of liability. Citing *Kahlenberg v. Goldstein*, 290 Md. 477, 431 A.2d 76 (Md. App. 1981), the Slighs argue that liability for negligent entrustment is not based upon the continued ownership of the chattel by the supplier, nor is it based upon the supplier's reservation either of the right to permit or the power to prohibit the use of the chattel. Instead, the supplier's liability is based upon his negligent entrustment when it operates together with the negligence of the user to become a concurrent cause of the injuries sustained. *Id.*

¶11. Further, the Slighs contend that the primary issue in this case is: What did Harreld know or have

reason to know about Gene Lorance's incompetence to drive safely and the likelihood that he would operate the vehicle in such a manner as to involve an unreasonable risk of physical harm to himself or others.

¶12. The Slighs argue that they gave sufficient proof that Harreld knew, at the time of the sale, that Gene Lorance was an habitual drunkard and drug addict who suffered from mental problems; who had frequently been convicted of driving while intoxicated; and who had been involved in numerous motor vehicle accidents while drunk. Citing from the deposition of Gene Lorance, the Slighs further argue that Harreld Chevrolet should have known that Lorance was high on alcohol and crack over the two day period during which he purchased the pick-up in question from the dealership.

¶13. In their brief the Slighs offer that over sixty years ago, the Mississippi Supreme Court declared that an habitual drunkard is an incompetent driver. *Slaughter v. Holsomback*, 165 Miss. 161, 147 So. 318 (1933).

¶14. Since this is a case of first impression the Slighs cite cases from other jurisdictions holding that a cause of action for negligent entrustment exists against a car seller when the seller has reason to know that a prospective buyer is incompetent. See, *Small v. St. Francis Hosp.,* 220 Ill. App. 3d 537, 163 Ill. Dec. 203, 581 N.E. 2d 154 (1991).

¶15. The Slighs contend that liability for negligent entrustment turns upon what the seller knew or should have known regarding the likelihood that the buyer would use the product entrusted to the detriment of another. Further, they contend that they have created a genuine issue as to what knowledge Harreld, through its agents and employees, possessed or should have possessed regarding Lorance's propensity to drive drunk.

¶16. The Slighs argue that Harreld is liable for supplying Lorance with a dangerous instrumentality. They contend that the law in Mississippi is clear that an automobile, although not usually a dangerous instrumentality, becomes one when driven by an incompetent driver. See *Permenter v. Milner Chevrolet Co.*, 91 So. 2d 243 (Miss. 1956); *Slaughter v. Holsomback*, 147 So. 318, 322 (Miss. 1933). Citing *Robert v. Williams*, 302 F. Supp. 972, 987 (N.D. Miss. 1969), the Slighs contend that it has long been considered negligence for one to allow another to use an instrumentality with the knowledge that he will likely use that instrumentality in such a way to create an unreasonable risk of harm to another.

¶17. In the case at bar, the Slighs argue that Gene Lorance was obviously a member of a class, namely alcoholics, "notoriously likely" to misuse an automobile if allowed to drive one. The Slighs argue that Harreld should have known that Lorance was drunk and high on cocaine when he purchased the truck. Further it is argued that Harreld owed a duty of care not to provide a dangerous instrumentality to Lorance, a known habitual drunkard and is therefore liable for any injuries arising out of its entrustment of this dangerous instrumentality to Lorance whom Harreld, by its agent Presley, knew was a danger to himself and to others.

¶18. Arguing proximate cause, the Slighs contend this Court emphasizes the concept of "putting in motion." "The original actor will not be absolved of liability because of a supervening cause if his negligence put in motion the agency by or through which injuries were inflicted." *M & M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So. 2d 615, 618 (Miss. 1988).

¶19. The Slighs contend that the fact that the accident which injured William Sligh occurred more than two

years after the sale of the vehicle to Lorance does not interrupt the negligence of Harreld or the agency it put in motion nor does it make the injury to the Slighs any less foreseeable. The agency which Harreld set in motion (i.e. Lorance operating a dangerous instrumentality while drunk), was still in motion, unchanged, on the day Lorance hit William Sligh's vehicle. Therefore, the actions of Harreld were a proximate cause of the injuries to William Sligh. For these reasons, the Slighs argue that summary judgment should not have been granted.

¶20. Appellee, Harreld, contends that in order for the Slighs to prevail under the theory of negligent entrustment, they must bring forth credible evidence that Harreld Chevrolet either knew or should have known that Gene Lorance was unfit or unable to operate a motor vehicle. Harreld states that the record in this case demonstrates that it did not know nor did it have reason to know that Lorance was incapable of operating the vehicle. In his deposition, Gene Lorance testified that he had a valid driver's license at the time of the purchase.

¶21. Harreld argues that to hold it liable in this case, this Court would have to find not only that Harreld owed a duty to determine who is and who is not a safe driver, but that Harreld must monitor the lifestyle of each and every customer to whom it sells a vehicle for the entire period of ownership.

¶22. Harreld contends that contrary to the assertions of the Slighs, Bob Presley, the truck manager of Harreld Chevrolet, testified that although he had known Gene Lorance for a number of years, he did not socialize with Lorance and was not aware of Lorance's reputation for abusing alcohol or that Lorance had undergone treatment for alcoholism.

¶23. Further, Harreld argues that there is simply no evidence presented by the Slighs that Harreld Chevrolet should have or even could have predicted that Lorance would become an unsafe driver and cause an accident two and one-half years after it sold him a vehicle.

¶24. Harreld relies on *Horne v. Vic Potamkin Chevrolet, Inc*., 533 So. 2d 261 (Fla. 1988) for the proposition that an automobile dealership does not have the obligation or legal right to serve as an agent of the Department of Motor Vehicles to act as a "secondary screening mechanism for detecting bad drivers." See *Shearson Lehman Brothers, Inc. v. Pujol,* 505 So. 2d 560, 563 (Fla. 3 Dist. Ct. App. 1987).

¶25. Harreld contends that there has been no proof whatsoever that Harreld knew or had reason to know that Gene Lorance would begin to drink heavily in the years following the sale of the truck, would drive his vehicle while drunk in violation of Mississippi law and after losing his license, cause the subject collision.

¶26. Harreld argues that the Sligh's reliance on *Richton Tie & Timber Co. v. Smith*, 210 Miss. 148, 48 So. 2d 618 (1950) is misplaced. In *Richton*, Richton sold a Ford truck to Charlie Johnson. The sale was secured by Deed of Trust executed by Johnson which contained the following provision:

It shall further become part of this instrument that Grantor [Johnson] will:

(1) Haul masonite wood and/or load cars for and on behalf of beneficiary [Richton Tie & Timber], for which he shall receive the prevailing rates of compensation, and will not use or operate said truck for other purposes without the specific consent of the beneficiary...

*Id.*

¶27. The Deed provided that in the event of default payment or the terms or conditions of the sale, Richton would retake possession of the truck and could satisfy the terms of the contract. *Id.* at 620. On January 9, 1949, Johnson and A.W. Turner were operating the truck at a speed in excess of 80 miles per hour. The truck crashed into a building owned by the appellees. The jury returned a verdict for the appellees in the amount of $6,500.00 and Richton Tie & Timber appealed.

¶28. In finding Richton liable, this Court recognized that where a supplier of a vehicle retains control over the vehicle, then the supplier cannot escape liability. Further, as the owner of the vehicle, Richton could have withdrawn the truck from Johnson's possession at any time. Harreld argues that by stating that Richton "could have become wholly severed from the relations with Johnson and the truck in the event Johnson paid the note in full," the Supreme Court indicates that relinquishment of control also severs liability on the part of the former owner. Harreld contends that this case clearly supports its position in the case because it retained no ownership or control over the vehicle and clearly had no legal right to refuse control or possession.

¶29. Harreld argues that it cannot be held liable for placing a dangerous instrumentality in the hands of Lorance. First, the Slighs have not put on any evidence that Lorance was an incompetent driver at the time the vehicle was purchased. Gene Lorance held a valid drivers license at the time of purchase. Harreld argues that hold it liable under this theory, this Court would have to find that Harreld owed a duty not only to determine who is and who is not a safe driver, but also, that Harreld must continue to monitor the lifestyle of each and every customer to whom it sells a vehicle for the entire length of time that the person owns the vehicle. Harreld cites *Roberts v. Auto Plan, Inc.*, 632 So. 2d 642, 643 (Fla. 1994), for the proposition that "under Florida law, once a bona fide sale has occurred, an automobile dealership cannot be held liable under the dangerous instrumentality doctrine for a buyer's negligent operation of a vehicle.

¶30. Harreld argues that its sale of the vehicle to Lorance was not the proximate cause of the subject accident. Further, Harreld should not be held liable because it "put into motion" the events leading up to the accident because it ignores the fact that Mississippi Courts have consistently refused to hold sellers liable for damages inflicted by third persons, even where the product sold was the "occasion" of the act. See *Robinson v. Howard Brothers of Jackson, Inc.*, 372 So. 2d 1074 (Miss. 1979).

¶31. Harreld asserts that the proximate cause of the subject accident was the negligence of Gene Lorance in driving his vehicle under the influence of alcohol, not the fact that Harreld Chevrolet sold a vehicle to Lorance two and one-half years prior to the date of the accident. For these reasons, Harreld contends that the lower court was correct in granting summary judgment.

¶32. The doctrine of negligent entrustment provides:

> One who supplies directly or through a third person a chattel for use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise , to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Restatement (Second) of Torts § 390.

¶33. We must first consider whether Harreld Chevrolet is a supplier of a chattel for purposes of § 390 of

the Restatement. Suppliers in terms of the Restatement must have the right to control the chattel. ***Broadwater v. Dorsey***, 344 Md. 548, 555, 688 A.2d 436 (1997). "The paramount requirement for liability under the theory of negligent entrustment is whether or not defendant had a right to control the vehicle."***Id***. at 561. See ***Lopez v. Langer,*** 114 Idaho 873, 761 P.2d 1225, 1227 (1988); ***Casebolt v. Cowan***, 829 P.2d 352, 359 (Colo. 1992); ***Alioto v. Marnell***, 402 Mass. 36, 520 N.E. 2d 1284, 1286 (1988).

¶34. After the sale of the vehicle, Harreld Chevrolet had no control over it. "The doctrine ought not be extended where the party sought to be charged had no control over the machine and the other party actually committing the injurious wrong was the owner, sui juris."***Estes v. Gibson,*** 257 S.W. 2d 604, 607-08 (Ky. Ct. App. 1953).

¶35. In ***Horne v. Vic Potamkin Chevrolet, Inc.***, 533 So. 2d 261, respondent sold a car and allowed the purchaser to drive away with the car even though its agent salesman knew that the purchaser was an incompetent driver. Shortly after leaving the dealership, the purchaser was involved in a single-car accident which injured her passenger, petitioner Horne. The issue presented in that case was whether under those circumstances the seller of a motor vehicle is liable under the theory of negligent entrustment. In holding that there was no liability the court reasoned:

> It is clear that under existing law there is no liability on the part of the seller of a motor vehicle where beneficial ownership or legal title, together with possession, have been transferred to a purchaser and injuries occur because of the negligence of the purchaser operating the vehicle. In short, transfer of ownership cuts off liability on the part of the former owner.

*Id.* at 262. The Court declined to focus on the act of selling rather than transfer of legal title stating:

> First, we are not persuaded that it would be possible for the courts to circumscribe the cause of action to instances where the seller becomes aware of the purchaser's incompetency as a incidental by-product of the normal sales routine. Stripped from this mooring, the terms "with knowledge" and "knowingly" would become an added source of litigation placing a new and uncertain burden on commerce and ordinary business relationships. Sellers would find it necessary to protect themselves from liability by inquiring into and verifying the competency of the purchaser to operate the vehicle. Such a rule would be inconsistent with the proposition that "[a] basic function of the law is to foster certainty in business relationships, not to create uncertainty by establishing ambivalent criteria for the construction of those relationships."

*Id.*

¶36. Another question presented in this case is whether or not Harreld Chevrolet had the requisite knowledge of Lorance's drinking habits and that he would likely endanger a third party. There is no evidence in the record which would indicate that Harreld Chevrolet had knowledge of Lorance's drinking habits. Harreld Chevrolet sold a truck to Lorance and no further relationship existed between the two. A review of the record shows no evidence that Lorance appeared at the dealership in a drunken state. Further at the time of the purchase he possessed a valid drivers license. There is no causal connection between the sale of the automobile and the accident which occurred two and one-half years later.

¶37. Finding no liability for negligent entrustment; no liability for supplying a dangerous instrumentality; and

no proximate cause, the lower court was proper in granting summary judgment.

## II. THE TRIAL COURT'S GRANT OF SUMMARY JUDGMENT FOR FIRST NATIONAL BANK WAS ERROR.

¶38. In their second assignment of error, the Slighs contend that the trial court erred in granting summary judgment to First National Bank because the bank's relationship with Lorance created legal duties for the bank; the negligence of the bank was the proximate cause of William Sligh's injuries; the bank is liable for entrusting a dangerous instrumentality to Lorance; and the bank is liable for breach of fiduciary duties.

¶39. The Slighs argue that FNB not only served as lender to Lorance, but served as banker, Trustee, advisor, counselor and consultant. In controlling the corpus of the trust, the invasion of the corpus of the trust, the income from the corpus and payments out of the trust, the Slighs contend that FNB exercised a degree of power and control over Lorance.

¶40. The Slighs rely on Uniform Trustee's Powers Act, Miss. Code Ann. § 91-9-101 et seq. (Rev. 1994) which requires that the Trustee perform every act as a "prudent man" meaning in "the manner in which men of ordinary prudence, diligence, discretion, and judgment would act in the management of their own affairs." *Id*. § 91-9-103(c). Therefore, the Slighs contend, the bank was charged with acting, in the management of the Trust, as it would if it was managing its own affairs in the same situation.

¶41. Under the terms of the trust, the bank had the power and duty to expend the trust proceeds "for the best interest of ... Gene Lorance, and shall pay to... Gene Lorance such sums and at such times as my said Trustee thinks in ... his best interest." From these terms, the Sligh's argue that the bank was under a duty and had the power to determine the safety, well-being, and best interests of Lorance and to inquire affirmatively into and determine Lorance's best interest in paying Lorance any funds.

¶42. The Slighs contend that the bank had the ability to control whether Lorance received treatment for his alcoholism. Also, the Slighs contend that the bank had the ability to cut off the stream of money which Lorance used to support his alcoholic habits. Further, they contend that the bank had the ability to seek to have Lorance declared incompetent and unable to care for his own affairs. However, the bank did none of these things.

¶43. The Slighs contend that the duty of the bank to control Lorance arises by virtue of (1) the exercise of control by the bank over another (Lorance) or the ability to control another; plus (2) the forseeability that harm might occur to a third party if that control is not exercised reasonably. The Slighs offer "Implicit in the duty to control is the ability to control." *Lundgren v. Fultz*, 354 N.W. 2d 25, 27 (Minn. 1984).

¶44. Citing *Karbel v. Francis*, 709 P. 2d 190, 193 (N.M. Ct. App.1985), the Slighs state: The element of control has been held to be dispositive of the existence of a duty owed to a third person. Whether a defendant has exercised control over another person or has the ability to control another are questions of fact for the jury. *Id.*

¶45. Relying on the Lorance's deposition, the Slighs argue that FNB had a great deal of control over Lorance by virtue of its control over his finances. Some examples given by Lorance are: the bank controlled whether the roof on Lorance's house was fixed; the bank had a hand in to whom Lorance sold his car; the bank controlled whether Lorance would receive treatment at St. Dominic's Hospital; and the bank controlled whether Lorance would continue to receive monthly income from the trust and whether the

corpus would be invaded for Lorance's benefit. In the case sub judice, the Slighs contend that the bank's ability to control Lorance's access to both alcohol and a vehicle through the control of his money is solely a question for the jury.

¶46. Further, the Slighs contend that the bank had the actual knowledge that Lorance was a habitual drunkard and drug addict. The Slighs contend that Lorance testified under oath that Tommy Vaughn, President of the Pickens Branch of the bank, knew of his drinking tendencies. The Slighs also contend that Lorance testified that Barbara Edwards, an employee of the Pickens branch, had seen him intoxicated on several occasions. In addition, citing from the deposition of Tommy Vaughn, the Slighs contend that Tommy Vaughn authorized the payment out of the subject trust to St. Dominic's for alcoholic rehabilitation and treatment of Lorance.

¶47. The Slighs cite *Levy v. McMullen*, 152 So. 899 (Miss. 1934), for the proposition that even if the bank only knew that Lorance was an occasional drinker, that knowledge amounts to actual knowledge sufficient to put the bank on inquiry which would have led to full knowledge of his general reputation as an habitual drunkard.

¶48. In his deposition, Lorance stated that he had several vehicular accidents and received numerous D.U.I. citations. He testified that he had been admitted to at least five different rehabilitation facilities for alcoholism. From this testimony, the Slighs argue that it was forseeable to the bank that if Lorance was continually given money from the trust that he would continue to drink his life away and engage in activities while drunk, including driving, that would endanger himself and others. Further, it is argued that it was also forseeable to the bank that if it financed Lorance's purchase of a vehicle, he would drive drunk and would be likely to harm an innocent person such as the plaintiff.

¶49. The Slighs cite *M&M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So. 2d 615, 618 (Miss. 1988) for the proposition that "The original actor will not be absolved of liability because of a supervening cause if his negligence put in motion the agency by or through which injuries were inflicted." The Slighs also rely on *Ross v. Louisville & Nashville RR.*, 172 So. 752, 755 (Miss. 1937), for the proposition that "If the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and injury."

¶50. Based upon these authorities, the Slighs argue that it is clear that the bank could and should have anticipated that someone such as William Sligh would be injured if Lorance was provided with the financing to obtain a vehicle while Lorance continued to receive disbursements from the trust with which to purchase alcohol, thereby enabling him to drink and drive.

¶51. The Slighs argue that the bank was negligent by financing the purchase of the S10 pickup by Lorance which was involved in the accident at issue. They further contend that section 390 of the Restatement (2d) of Torts is equally applicable to the bank since the bank supplied the truck to Lorance through a third person. The Slighs argue that the banks' financing the purchase of the truck with knowledge that Lorance would likely use it in such a manner as to create an unreasonable risk of harm to others creates liability on the part of the bank.

¶52. The Slighs contend that there was sufficient evidence to put the bank on notice that Gene Lorance was an alcoholic and a drug abuser. For this reason, the bank's loan of money to Lorance to buy a car violated the duty of the bank as a fiduciary.

¶53. Given the above reasons, the Slighs argue that the trial court erred in granting summary judgment to FNB. They argue that the existence of the disputed material facts means that summary judgment should not have been granted.

¶54. The Appellee, FNB, contends that the Slighs have utterly failed to demonstrate any legitimate basis for holding FNB liable as a trustee for the actions of Lorance, an adult income beneficiary of a trust administered by them.

¶55. FNB argues that the Slighs attempt to expand the trust into a conservatorship or guardianship. They assert that the only relationship was that of a trust imposed relationship. The duty of FNB was to administer the trust in accordance with the trust agreement by disbursing the funds and maintaining the trust corpus.

¶56. The powers the trust gave to FNB are as follows:

(A) expend all or any part of the income of corpus of said trust property... for the benefit of Gene Lorance...;

(B) make payments directly to Lorance or to anyone for him;

(C) invest, reinvest, manage and care for said property...;

(D) all powers conferred by the Uniform Trustees Powers Act.

These duties, FNB asserts, simply involved the handling of money and nothing more. FNB provided a stipend to Lorance for his living expenses. Additionally, FNB paid for repairs to the roof of his parent's house. Lorance paid his own bills and took care of himself. FNB relies on the testimony of Gene Lorance wherein he stated that FNB in no way controlled the affairs of his life.

¶57. FNB cites *Deposit Guaranty Nat'l Bank v. First Nat'l Bank of Jackson*, 352 So. 2d 1324, 1327 (Miss. 1977) for the proposition that "It is undisputed that under controlling law an unambiguous contract, such as the trust documents at issue, are to be interpreted and enforced based solely on the four corners of the document. FNB asserts that as the Lorance trust documents clearly and unambiguously set forth the limited responsibilities, the Slighs efforts to expand upon these duties are barred as a matter of law.

¶58. FNB addresses each contention of the Slighs. First, the Slighs claim that FNB should not have provided the monthly living expenses which would have prevented Lorance from having alcohol money. FNB argues that this claim fails because Lorance was already receiving disability checks from the government.

¶59. Second, FNB argues that the Slighs allege on appeal for the first time that FNB should have Lorance declared incompetent by a court order to prevent him from driving. Citing *Touart v. Johnston*, 656 So. 2d 318, 321 (Miss. 1995), FNB states that this Court has long followed the rule, however, that an "appellant is not entitled to raise new issues on appeal since to do so denies the trial court the opportunity to address the matter." However, in further addressing the matter, relying on the deposition of Gene Lorance, he testified that FNB had no knowledge of his alleged prior accidents. FNB submits that it had no such duty or ability under the trust provisions to have him declared incompetent.

¶60. Third, FNB addresses the financing of the truck. The Slighs assert FNB is responsible for the accident

because FNB financed the truck. Citing **Grisham v. John Q. Long VFW Post,** 519 So. 2d 413, 417 (Miss. 1988), FNB states that Mississippi law is well settled that "the proximate cause of an injury is that cause which in natural and continuing sequence unbroken by an efficient intervening cause produced the injury, and without which the result would not have occurred. FNB notes that Lorance already owned a vehicle at the time of the loan in question.

¶61. FNB argues that no duty to the Slighs existed. FNB relies on **Stanley v. Morgan & Lindsey, Inc.**, 203 So. 2d 473, 475 (Miss. 1967) for the proposition that some duty must exist between a plaintiff and defendant before recovery will be allowed, stating "actionable negligence cannot exist in the absence of a legal duty to the plaintiff." In the absence of any such duty, the existence of which is a question of law to be answered by the court, judgment for the defendant is necessary. **Morgan & Lindsey**, 203 So. 2d at 475. FNB contends that the Slighs have not identified any duty allegedly owed to them by FNB.

¶62. In addressing negligent entrustment FNB cites § 390 of Restatement (Second) Torts which provides:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, subject to liability for physical harm resulting to them.

Restatement (Second) of Torts, § 390. FNB quotes the case of **Broadwater v. Dorsey**, 666 A. 2d 1282, 1286; rev'd on other grounds, 688 A. 2d 436 (Md. App. 1995).

> The Restatement articulation of the [negligent entrustment] tort contains a number of discrete elements. The defendant must supply the chattel; he must know or have reason to know that the person he supplies it to is likely to use the chattel in a manner involving an unreasonable risk of physical harm to other persons; and he must have reason to expect that those other persons may be endangered by the entrustees use of the chattel.

**Dorsey**, 666 A. 2d 1282, 1286.

¶63. FNB contends that it is not a supplier of a chattel as required in negligent entrustment. FNB relies on the case of **Peterson v. Halsted**, 829 P. 2d 373 (Co. 1992). In that case the Supreme Court of Colorado addressed the question of whether a person who supplied credit for the purchase of a vehicle could later be found liable to a third party under a negligent entrustment theory. In Peterson, the defendant co-signed on a loan with his adult daughter Tamera in order for Tamera to purchase a vehicle. Tamera later drove the vehicle while intoxicated and collided with the plaintiff, killing plaintiff's daughter. The court found that Tamera had an alcohol problem which was known to her parents prior to co-signing on the loan. The Supreme Court framed the pertinent issue as follows:

> [W]hether the indirect facilitation of the purchase of a vehicle by a third person, as by Donald Peterson's lending his credit to Tamera, is sufficient to make that person a supplier of a chattel under § 390 [of the Restatement].

In answering this question in the negative, the Court stated:

> [W]e think it unwise and destructive of flexibility of analysis to classify suppliers of money or credit categorically as suppliers of chattels under § 390 even though the loan or credit may be essential to

the borrower in obtaining possession of the chattel.

*Peterson*, 829 P. 2d at 378. Following this holding FNB contends that as a mere furnisher of credit, it cannot be construed as a "supplier of chattel" under a negligent entrustment theory.

¶64. FNB argues that it did not know nor did it have reason to know that Lorance should not have been driving. FNB relies on the statements of its employees wherein it is unformly denied that anyone had any knowledge of the purported dangers of Lorance's driving or that Lorance purportedly had a dangerous reputation. FNB states that the only reputation evidence that the Slighs have presented comes from Lorance himself.

¶65. FNB argues that even if it were established that it met the elements of negligent entrustment, the accident was too remote in time. The loan for the vehicle in question was made on August 22, 1990. The accident occurred on January 30, 1993. The loan was paid in full on January 8, 1991, well before the date on which the accident occurred.

¶66. FNB argues that it owed a duty to Lorance in regard to the administration of the trust. The duty related to finances. FNB asserts that there has been no evidence to show that there was a breach in that duty. However, FNB contends that any such action would necessarily have to be commenced by Lorance, as beneficiary of the trust rather than the Slighs.

¶67. Further, FNB asserts that the Slighs have also failed to establish proximate cause. FNB contends that for the foregoing reasons the lower court was proper in its grant of summary judgment.

¶68. Upon acceptance of the trust by the trustee, he is under a duty to the beneficiary to administer the trust. Restatement (Second) of Trusts § 169.

¶69. The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill. Restatement (Second) of Trusts § 174.

¶70. According to Restatement (Third) of Trusts § 5 Trusts and Other Relationships, the following are not trusts: (c) guardianships and conservatorships....

¶71. In the case sub judice, the terms of the trust agreement are as follows:

1. My said Trustee shall have full and complete authority to expend all or any part of the income or corpus of said trust property for the benefit of myself and my said son, Gene Lorance, and shall have the right to make payments directly to me and to my said son or to anyone for myself or my said son.

2. The Trustee shall have the right to invest, re-invest manage and care for said property in the same manner as though said property was the individual property of said Trustee, and my said Trustee shall not be required to give bond, or account to Court, and shall have all the powers conferred by the Uniform Trustees' Powers Act as the same is now in force in the State of Mississippi and the power to sell, lease or encumber real property. My said Trustee shall exercise the powers herein granted for what may be, in the discretion of my said Trustee, in the best interest of myself and said Gene Lorance, and shall pay to me or the said Gene Lorance such sums and at such times as my said

Trustee thinks in my or his best interest....

¶72. The Slighs main argument is that FNB had control over Lorance and therefore should be liable for his actions. FNB is the trustee of a trust set up for the benefit of Gene Lorance. Its duty is to administer the trust. In evaluating the terms of the trust agreement, there is no language in which FNB was to take control of Lorance. Gene Lorance was given a monthly check to pay his bills and take care of his needs. The Slighs argument must fail because a review of the record indicates that the only relationship between FNB and Lorance is that of trustee and beneficiary.

¶73. The next question is whether FNB can be liable for negligent entrustment. Mississippi courts generally follow the rule established by the Restatement (Second )of Torts § 390 which provides that:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

Restatement (Second) of Torts § 390

¶74. Since the Mississippi courts have not been presented with the question of whether a bank is a supplier of chattel, the trial judge looked to the Supreme Court of Colorado for guidance. The trial judge followed the holding in *Peterson v. Halsted*, 829 P.2d 373 (Co. 1992), that to create a duty on lenders to make in-depth inquiries into an applicant's persona, at the time of the loan, in order to avoid future liability at some indefinite future moment, stretches the application of § 390 beyond its intended scope. This Court agrees and follows *Peterson v. Halsted.*

¶75. The Slighs, failed to demonstrate that there is more there is no causal connection between the lending of credit for the purchase of an automobile and the accident two an one-half years later. The lower court was correct in granting summary judgment. There are no genuine issues as to material facts presented to defeat summary judgment.

**CONCLUSION**

¶76. In the case sub judice, the lower court did not err in granting summary judgment. The evidence in the record presented no genuine issue as to a material fact. The Slighs relied heavily on the deposition of Gene Lorance and others as their source of facts. However, the record contained only excerpts of depositions which still supported the ruling of the lower court. Accordingly, the judgment of the lower courts grant of summary judgment is affirmed.

¶77. **JUDGMENT AFFIRMED.**

**PRATHER, C.J., SULLIVAN, P.J., BANKS, ROBERTS, MILLS AND WALLER, JJ., CONCUR. PITTMAN, P.J., CONCURS IN RESULT ONLY. McRAE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**